DECISION
This motion is before the Court for decision on Defendants' Motion to Dismiss, pursuant to Rule 29 of the Rhode Island Rules of Criminal Procedure, the Town of Tiverton's Municipal Ordinance complaint against them, which charges them with a violation of the Tiverton Zoning Ordinance, Article IV, Section 13(a) and alleges that the Defendants were impermissibly manufacturing compost in an R-80 zoning district.
 Standard of Review
In a proceeding such as this one, a municipal appeal tried denovo before the Court sitting without a jury, a motion to dismiss may be filed at the close of the Town's case to challenge the legal sufficiency of Town's trial evidence. Super. R. Crim. P. 29(b). In this procedural scenario: *Page 2 
 "when evaluating a motion to dismiss, the trial justice, acting as fact-finder; must: `weigh and evaluate the trial evidence, pass upon the credibility of the trial witnesses, and engage in the inferential process, impartially, not being required to view the inferences in favor of the nonmoving party, and against the moving party. After so doing, if the trial justice . . . concludes that the trial evidence is sufficient to establish guilt beyond a reasonable doubt, he or she denies the defendant's motion to dismiss. . . . If the evidence is not so sufficient, he or she grants the motion and dismisses the case.'" State v. Adewumi, 966 A.2d 1217, 1222-23 (R.I. 2009) (quoting State v. Forand, 958 A.2d 134, 141 (R.I. 2008)).
 Factual Background
The within case was commenced by the Town of Tiverton with the service of a summons upon James and Melissa Pelletier of 409 East Road, on March 16, 2009, requiring them to appear in Municipal Court on April 9, 2009 to answer to a charge that they were in violation of the Tiverton Zoning Ordinance, Article IV, Section 13(a) because "manufacturing compost is not permitted in an R-80 zoning district." (Ex. H.) A residential R-80 district is defined as an area of the town, which is "composed of agricultural uses, low density residential areas and certain open spaces for which development at a density at or lower than one dwelling unit per 80,000 square feet is considered appropriate." (Ex. A.) Article IV, Section 13 provides that "industrial uses" contained within the "district use regulations" prohibits (in subsection (a)) "manufacturing, storing, processing, and fabricating *Page 3 
activities"(Ex. 4.) in an R-80 zone. Nowhere in the Tiverton Code of Ordinances are the terms "compost," "composing" or "manufacturing" defined.
The pivotal inquiry is whether the Town has sustained its evidentiary burden of proving, beyond a reasonable doubt, that the Pelletiers have been "manufacturing compost."
 Evidentiary Record
In support of its prosecution, the Town presented the following three witnesses: Daniel Lawton, a Rhode Island Department of Environmental Management (DEM) environmental scientist affiliated with the office of Compliance and Inspection's Solid Waste Program; Gareth Eames, the Town's building and zoning official; and citizen Peter Mello of 1912 Crandall Road, five houses north and 300 feet away from the Pelletiers' property.
Mr. Lawton first inspected the site of MR. Pelletier's Tiger Tree Nursery on Crandall Road on February 8, 2007 to respond to a complaint of improper disposal of clamshells. (Tr. at 7.) Although he did not find any clamshells, he did observe a "pile of manure" and a pile of tree waste, specifically "wood chips." Mr. Pelletier indicated to Mr. Lawton, at that time, that he was "beginning to start a tree nursery at the property." (Tr. at 8.) Mr. Lawton's second inspection occurred on October 8, 2008, on this occasion to make an assessment of solid waste. He testified that he observed "a pile of screened, composted solid waste that was *Page 4 
approximately 61 cubic yards," (Tr. at 21.) "a pile of wood chips that was approximately 370 cubic yards, a pile of soil mixed with manure and bedding that was approximately 100 cubic yards, a pile of soil mixed with composted solid waste that was 133 cubic yards, a pile of soil mixed with a small amount of manure and bedding that was 89 cubic yards approximately, a pile of yard waste, leaves and shrub trimmings that was [sic] approximately 2.5 cubic yards, a pile of composed solid waste mixed with soil that was approximately 41 cubic yards, a pile of manure and bedding that was approximately 100 cubic yards, a pile of composted solid waste that was approximately 98 cubic yards, and a pile of composted solid waste that was approximately 80 cubic yards." (Tr. at 22-23.) Mr. Lawton did not observe any animals on the property and there was "no indication of where the manure came from." (Tr. at 25.) He did observe a "small area" with "approximately 50 [landscaped trees,]" and a "field where grass was growing." (Tr. at 26.) He did not, on any of his four visits, view any crops[1] growing. (Tr. at 28.) Mr. Lawton took on-site photographs of piles of manure, screened compost, soil mixed with compost, leaves and stones. He estimated the total amount of solid waste[2] and compost to be 1,709 cubic yards and 430 cubic yards, respectively. Specifically, during his October 2008 inspection, Mr. Lawton *Page 5 
testified that he did observe "that compost was being made on the property" (Tr. at 46.), although, he did not actually witness anyone "combining any of [the] materials." (Tr. at 62.) His contemporaneous report of that visit, however, states as follows: "the composted solid waste originating from off-site as documented in previous inspections, appeared to be decomposed to the point that the original material was no longer recognizable except for pieces of chipped tree waste in the unscreened piles. The composted solid waste appeared stable and there was no steam or odor emanating from the piles. I reviewed my files with Mr. Pelletier when he arrived. He attributed the reduction in the amount of compost on site to using it on site for field application and tree planting. There is a small field of landscaped trees next to the composting area and other larger grass fields behind the composting area. Prior inspections also documented use of the composted solid waste in saleable products." (Ex. 1 at 1.)
The next witness presented by the Town was Gareth Eames, the Town's Building and Zoning Official. Mr. Eames first inspected the Pelletier property in the summer or fall of 2005 after receiving a complaint that a sand and gravel operation was being conducted on the premises. (Tr. at 69.) He viewed on site trucks, heavy equipment, earth moving equipment, piles of sand, crushed stone, yard waste, loam, and manure. (Tr. at 71-72.) When Mr. Eames informed Mr. Pelletier about the nature of the complaint, which prompted the inspection, Mr. *Page 6 
Pelletier responded that he was "practicing his business, which was landscaping and nursery." (Tr. at 73.) Mr. Eames did not observe any "real crops[,]" only "small trees . . . lining the driveway." (Tr. at 73.)
After this visit, Mr. Eames forthwith reviewed the town's zoning ordinance and the state's Right to Farm Act. See
R.I.G.L § 2-23-4. He formed the opinion that Mr. Pelletier's operation was "covered" by the Right to Farm Act, even though landscaping is not included in the Act's definition of "agricultural operations."
Since that first visit, Mr. Eames office has received several hundred complaints about the subject property, and he has personally visited the site about 100 times. In the fall of 2008, Mr. Eames "had received complaints at that point that there was an operation going on for composting." (Tr. at 82.) After visiting the property, he concluded that Mr. Pelletier was manufacturing compost in violation of Article IV, Section 13(a) of the Town's ordinance. In January 2009, Mr. Eames issued a second notice of violation, containing a cease and desist order, to Mr. Pelletier.
Furthermore, during his fall 2008 visit, Mr. Eames noticed various pieces of earth moving equipment . . . a bucket loader, a skid steer . . . and a trommel. (Tr. at 88.) He described the latter piece of forty-foot long equipment as "a type of screening device . . . used for separating waste and screening topsoil with loam [and] . . . also used in composting." (Tr. at 89-90; Ex. 7.) In May of 2009, Mr. *Page 7 
Eames took more photos of the property, which display earth moving equipment, piles of crushed stone, blue stone, rubble, manure, and compost. (Tr. at 93; Ex. 8; Ex. 9; Ex. 10; Ex. 11.)
Approximately one month later, Mr. Eames was on site again, and he observed a manure spreader and a box screen — a device which separates stones from soil. (Tr. at 100.) Photographs of the property also depict piles of crushed stone, bluestone, rubble, loam, manure, compost, and yard waste. (Tr. at 100-01; Ex. 12, Ex. 13; Ex. 14; Ex. 15.)
The Town's final witness was Mr. Peter Mello, a resident of 1912 Crandall Road, which is located 300 feet away from the subject property. Mr. Mello testified that in 2007 "noise activity," specifically "construction noises" became apparent in the neighborhood. (Tr. at 187-88.) He heard bulldozers, the beeping of same when in reverse, and the "humming of heavy equipment [and] industrial equipment constantly in the background in the neighborhood." (Tr. at 189.) There was also an "increased volume of tractor trailers coming up and down the street" and entering the Pelletiers' property. (Tr. at 189.) Mr. Mello observed the tractor trailers "coming in and out [of the Pelletiers' property] emptying large quantities of material, rocks, [and what] appeared to be loam." (Tr. at 190.)
On December 31, 2008, or New Year's Day of 2009, Mr. Mello took photographs of the property, which depict the following: the use of a trommel, *Page 8 
finished product going out of a conveyor belt and into a pile, a bulldozer, trucks being operated, and trucks being loaded and unloaded. (Tr. 190-208; Ex. B at 18-26.) Furthermore, Mr. Mello has frequently noticed eighteen wheelers and dump trucks "dumping material on the property." (Tr. at 208.)
 Analysis
Mr. Pelletier asserts that the "Court must read Article IV, Section 13(a) of the Zoning Ordinance in the context of the entire Code, its particular subsection (industrial) and consider the Tiverton Town Council's intent in enacting the provision. In doing so, it is clear that the offense did not simply require a finding that appellants/defendants were manufacturing compost beyond a reasonable doubt, but also a finding that they were, industrially manufacturing compost or `manufacturing compost' for an industrial purpose within the intent of Article IV, Section 13 of the Zoning Code, which is entitled "Industrial Uses." (Defs.' Memo. at 6.)
Mr. Pelletier assails the "evidence in this motion [as] replete with uncertainty, speculation, and conflicting trial testimonies and exhibits." (Defs.' Memo. at 10.) He cites, in part, as evidentiary deficiencies, the following: (1) Mr. Lawton did not take any samples of what he believed to be compost; (2) Mr. Lawton never saw anyone working on the property; (3) Mr. Lawton had no idea where the piles of material he witnessed came from; (4) Mr. Lawton testified that *Page 9 
compost is created by a biological process, rather than a manufacturing process; (5) Mr. Lawton did not inspect the "farm field"; (6) by Mr. Lawton's own standards, 400 cubic yards of compost would be required to sustain 50 nursery stock trees; (7) Mr. Eames has little or no experience in farming or nursery operations; (8) earlier zoning certificates sanctioned Mr. Pelletier's use of the property, which were not appealed or overturned; (9) Mr. Eames gave contradictory evidence concerning the Right to Farm Act; (10) Mr. Eames did not look up the definition of "manufacturing" or "industrial"; (11) Mr. Eames did not take samples of the "compost" or dig any test pits; (12) the Court admitted that it makes compost to assist in crop growth[3] and that it would be ludicrous to conclude that this equates to industrial manufacturing of compost; and (13) Mr. Mello merely "believed" that he saw a trommel, a finished product, and compost.
The prosecution counters that the Court should look to the "plain and ordinary meanings" of the ordinance — regarding the undefined terms "compost," "composting," and "manufacture." The Town cites Webster's On-Line Dictionary defining the verb "manufacture" to mean: (1) to make or produce by hand or machinery, especially on a large scale; (2) to work up material into form for use; (3) to make or process [a raw material] into a finished product, especially by means *Page 10 
of large-scale industrial operation. (Town's Memo. at 3.) Countering the assertions of Defendant, the Town asserts the following: (1) Mr. Lawton has knowledge of the process of making compost for his experience in inspecting farms, work shops, seminars, and personal experience (Tr. At 19); (2) compost is produced by mining organic materials (manure, yard waste, leaves, grass, wood chips or shavings, wood scraps), sometimes with soil (to add desired qualities to end product) and the addition of air and moisture (achieved through mixing and turning) by using a loading device for large-scale operations (Town's Memo. at 5 (Tr. at 19-20.)); (3) Mr. Lawton observed, at the property, voluminous amounts of the necessary raw materials for making compost, the equipment necessary for large scale production of compost, and the completed compost product, as well as intermediate products for those raw materials (Town's Memo. at 5 (Tr. at 22-23, 60.)); (4) Mr. Pelletier admitted to Mr. Lawton on September 22, 2010 that he mixed the raw materials on site (Town's Memo. at 5 (Tr. at 63.)); (5) Mr. Eames' office has received several hundred complaints regarding composting activity at the site in question (Town's Memo. at 6 (Tr. at 81-82.)); (6) Mr. Eames, at the site, observed voluminous amounts of the raw materials and the equipment necessary for large scale production of compost, as well as piles of various mixtures of the raw materials and piles of the completed product (Town's Memo. at 6 (Tr. at 88-90, 73, 97, 100-03.)); (7) Mr. Pelletier stated, in the fall of 2008, to Mr. Eames "I *Page 11 
am making compost" (Town's Memo. at 7 (Tr. at 110.)); (8) Mr. Eames has never observed the property being used for farming; (9) Mr. Mello, on numerous occasions, observed material being placed into a trommel onto a conveyor belt, and distributed into new piles (Town's Memo. at 7 (Tr. at 192-98.)); (10) Mr. Mello recognized the material being produced by the trommel as compost (Town's Memo. at 7 (Tr. at 192, 226.)). Mr. Mello also observed, on many occasions, large industrial equipment being used on the property for moving and mixing the raw materials and the finished product (Town's Memo. at 7; Tr. at 188-90, 195, 198, 201, 207-08.); and (11) Mr. Mello has never observed the property being used for farming. (Town's Memo. at 7 (Tr. at 212.)).
In conclusion, the Town avers that "even using the less expansive definition of manufacture from Black's Law Dictionary ("the making of goods and wares by manual labor or by machinery") it is clear that Defendants are doing just that." (Town's Memo. at 7.)
No precedential authority within our State has been identified to provide guidance for, or illumination upon the pivotal issue in this controversy. The Court, therefore, looks to other jurisdictions, which have had occasion to address similar disputed issues and the consequent interpretation of relevant terms.
In the case of Clout, Inc. v. Clinton County Zoning HearingBoard, the landowners brought all materials (leaves, yard waste, Christmas trees, brush, *Page 12 
pallets, commercial organics, municipal bio-solids, chicken manure, apple pumice, and canning industry waste) used to produce compost from off site to be manufactured on site and "shipped off site for use elsewhere." 657 A.2d 111, 113 (Pa. Commw. Ct. 1995). The appellant in Clout contended that "its proposed compost facility [was] an agricultural use related to the tilling of the land and its plant as a structure necessary to the proper operation of agricultural activities [a permitted use]." Id.
As with the instant case, the applicable ordinances inClout lacked a specific definition of "composting" leading the court to reference Webster's New Collegiate Dictionary, defining "compost" as "a mixture that consists of largely decayed organic matter and used for fertilizing and conditioning the land."Id. at 114 (citing Webster's New Collegiate Dictionary 231 (1981)). In Clout, the citizen objectors argued that "the manufacture of compost . . . for off use premises is not an agricultural use but an industrial use, not permitted in an agricultural district, but allowed in the industrial district, permitted under [the ordinance] as `[a]ny manufacturing use including primary production from raw materials.'" Id. Significantly, the court stated that "[n]one of the compost to be made by appellant would be a product of its land and none of the compost would be applied by appellant to fertilize and condition its land." Id. *Page 13 
As to the latter component, there is evidence that Mr. Pelletier did utilize compost to nurture his young trees. However, the uncontradicted and credible evidence overwhelmingly establishes that raw materials, most pointedly, manure, were trucked in from off-site (no animals were ever observed on site). The intensity of heavy equipment use and the volume of the various materials, which could be utilized in the "compost recipe," compel the conclusion, beyond a reasonable doubt, that Defendant was engaged in the "manufacturing of compost" in violation of the applicable ordinances.
Therefore, Defendant's Motion to Dismiss the violation, pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure, is denied.
[1] Mr. Lawton obtained a Bachelor's Degree in Plant Science from the University of Rhode Island in 1988 and has been affiliated (initially as a seasonal intern) with the DEM since 1985.
[2] Mr. Lawton had earlier defined solid waste to be "anything that has been abandoned, dumped, or discarded in a quantity greater than 3 cubic yards. (Tr. at 5.)
[3] The compost referenced exists on a sixty-acre farm upon which horses and beef cattle are raised, and hay crops are grown and baled. The compost heap is comprised exclusively of materials, which are generated on site. Therefore, the property and compost situation is incomparable to the subject property.